**In re Kenneth R. CLARK, Debtor.**

**BOWLING GREEN LIVESTOCK MARKET, INC., Interpleading Plaintiff,**

v.

**George M. YOUNG, Counterclaimant.**

Bkrtcy. No. 95–30222(7).

A.P. Nos. 3059 & 3060.

United States Bankruptcy Court, W.D. Kentucky.

Aug. 29, 1996.

David Cantor, Louisville, for Debtor/Defendant Kenneth Clark d/b/a B & B Angus Service.

Quinton B. Marquette, Bowling Green, for Plaintiff Bowling Green Livestock Market, Inc.

Lisa Koch Bryant, Louisville, for Defendant/Counterclaimant George M. Young d/b/a Deep Down Ranch.

Brent Travelsted, Bowling Green, for Defendants, John Kiker; William Brockman; Brockmere Farms, Inc.; Jack Lowderman; and Myron Alexander.

Bruce A. Brightwell, Louisville, for William Stephen Reisz, Trustee.

## MEMORANDUM

DAVID T. STOSBERG, Bankruptcy Judge.

This case involves cattle—cattle brought to a stockyards, Bowling Green Livestock Market, Inc. (hereinafter referred to as "BGLM"), by a convicted larcenist, the Debtor in this involuntary bankruptcy case. George Young ("Young"), is the owner of a ranch in Texas where he raises Black Angus Cattle.

### Findings of Fact

The story unfolds around the middle of October in the year 1994, when Jay Wright, Young's ranch manager, was preparing Young's cows for the annual production sale. As Wright explained at trial, the particular cattle raised by Young were purebred Black Angus cattle, normally sold as breeding stock. (Wright, TR 9–10). In prepping these special cattle for the highly-advertised production sale scheduled for October 30, 1994, Jay Wright ran them through a shoot where they were trimmed and groomed to look their very best. (Wright, TR 54–55).

Prior to the production sale, Ken Clark (hereinafter referred to as "Clark"), the Debtor in this involuntary proceeding, contacted Young about buying fifty head of these Black Angus cattle at the October 30, 1994 sale. The year before, Clark had purchased cattle from Young, so the parties had some familiarity with each other. (Wright, TR 29). Young and Clark entered into a contract for Clark's purchase of fifty head of Young's purebred Black Angus cattle. (Defendant's Exhibit 16). The contract provided that Clark, operating through an entity called B & B, would pay for one-half of the total purchase price on or before December 31, 1994, and pay the balance on or before March 1, 1995. The sale transaction between Young and Clark was clearly a "credit transaction." The contract further provided that the registration certificates, certifying that the Black Angus cattle were purebred, would be tendered to Clark upon Young's receipt of payment in full from Clark. Young signed the contract on August 15, 1994 and forwarded the contract to Clark for his signature. Young testified that the handwriting on the bottom of the contract was added by Clark, who executed the contract on September 7, 1994, and mailed the contract back to Young. (Young, TR 117). The handwritten portion of the contract provided that Clark was to be the only announced purchaser at the production sale and that whatever Clark did with the cattle subsequent to the sale would be of no concern to Young. (Defendant's Exhibit 16). Young stated at trial that he had no problem with the handwritten additions made by Clark to the contract. (Young, TR

118). Young testified further that he had "no clear idea" of what Clark intended to do with the cattle once they left Young's ranch. (Young, TR 121).

On November 10, 1994, Clark's trucker, Brent Yates, picked up the cattle and hauled them, per Clark's instructions, directly to BGLM, where they were sold the following day. Clark had telephoned Harlan Stice (owner of BGLM) and Jerry Belcher (employee of BGLM) and told them both to expect these Black Angus cattle. Clark told representatives of BGLM two variations of the following story: he was dispersing a herd of Black Angus cattle for an elderly gentleman in his 80's who could not keep up the registration papers. Clark was acting as a "Consignor," who is a person who sells cattle as the agent for the owner, for which the Consignor receives a commission. Several experts in the stockyard industry testified at trial that it is standard in the industry for Consignors to bring cattle (or have them delivered at their direction) to the stockyards for sale and that it is also commonplace for the stockyards to pay the sale proceeds directly to the Consignor. (Pearce, TR 69; Gibson, TR 86–87).

BGLM sold the cattle on November 11, 1994, at the direction of Clark and made a check payable to Ray Clark in the sum of $21,894.70 (which consisted of the $22,815 in sales proceeds less BGLM's commission).

Young now seeks to recover the full value of fifty head of cattle sold at BGLM on November 11, 1994, relying on the theory of conversion. Jay Wright testified that each cow had a value of approximately $1,200 as breeder cattle. Through the testimony elicited by Young's counsel at trial, Young also appeared to be pursuing a theory of negligence, which would require the Court to find that BGLM had a duty to inquire into the true ownership of the cattle either before selling the cattle, or before disbursing the sales proceeds to Clark.

### Conclusions of Law

We will address the two legal theories of recovery in the context of the facts presented through both trial and deposition testimony, which the Court has reviewed *in toto*.

## I. WHETHER BGLM CONVERTED YOUNG'S CATTLE.

The tort of conversion has three elements (which Young had the burden of proving at trial):

1). Young's ownership or right to possession of the cattle at the time of the sale by BGLM;

2). BGLM's conversion by a wrongful act or disposition of Young's property rights; and

3). Damages resulting from the conversion.

*See* 18 Am.Jur.2d CONVERSION § 2, pages 146–47 (2d ed. 1996).

With reference to the first element, the issue of passage of title arises. Specifically, the Court must determine whether Clark had title to the cattle when he delivered them to BGLM for sale. An action for conversion lies where there is an unauthorized disposition of collateral. *Ranier v. Gilford*, 688 S.W.2d 753, 755 (Ky.Ct.App.1985) (citing *White–Sellie's Jewelry Co., Inc. v. Goodyear Tire & Rubber Co.*, 477 S.W.2d 658 (Tex.Civ.App.1972) and *Chemical Bank v. Miller Yacht Sales*, 173 N.J.Super. 90, 413 A.2d 619 (1980)). In order to prevail under this first element of conversion, Young must show either: (1) absolute and unqualified title; or (2) qualified, limited title, provided that such title carries with it a right of possession. 18 Am.Jur.2d at § 75 (citing to, among other cases, *Pacific Finance Corp. v. Crouch*, 243 S.W.2d 432 (Tex.Civ.App.1951)). This first element is where Young's conversion argument goes awry as he failed to satisfy his burden of proving ownership.

In Kentucky, passage of title is governed by KRS 355.2–401(2), which provides:

Unless otherwise explicitly agreed title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods, despite any reservation of a security interest and even though a document of title is to be delivered at a different time or place.

There is no dispute that cattle are "movable goods" as defined by Kentucky's Uniform Commercial Code. KRS 355.2–105(1). The title dispute in this case centers around the registration certificates that accompany Black Angus Cattle. Young argues that title did not pass either by law or by agreement, because Young never effectuated a transfer of the cattle's registration papers to Clark. Young put on extensive factual and expert testimony with regard to the proper method for transferring the registration certificates that accompany Black Angus cattle. The Court, however, finds the procedure for the transfer of these certificates irrelevant based on the circumstances surrounding the Young–Clark credit sale transaction.

First of all, Young transferred possession of these cattle to Clark prior to receipt of any payment from Clark, in accordance with the terms of their contract. (*See* Defendant's Exhibit 16). The Court found Young's testimony with regard to the contract compelling. Young testified that he had no problem with the handwritten additions made by Clark to the contract. (Young, TR 118). The handwritten additions made to the contract by Clark provided that Young had no interest in what Clark did with the cattle once they left Young's ranch. (Defendant's Exhibit 16). The critical factual point is that Young sold these fifty head of cattle to Clark on credit, in the ordinary course of business, with the expectation that Clark would resell these cattle. Young, according to his own testimony, had "no clear idea" of what Clark intended to do with these cattle once they left Young's ranch. Young's only concern was receiving payment from Clark. (Young, TR 121).

Based on Young's testimony with regard to the circumstances surrounding the parties' contract, Young clearly intended to transfer title to the cattle to Clark at the time of delivery. Young "cloaked" Clark with all indicia of ownership, even though Young eventually became the victim of a fraud. *See Foley v. Production Credit Ass'n*, 753 S.W.2d 876, 878 (Ky.Ct.App.1988).

We find that Young transferred free and unfettered possession and title to Clark at the time of delivery, pursuant to KRS 355.2–401(2). *See Motors Insurance Corp. v. Safeco Ins. of America*, 412 S.W.2d 584 (Ky.1967) (where court held the physical delivery of goods effectuated the passage of title, even though the title papers had not been delivered); *Lexington Mack, Inc. v. Miller*, 555 S.W.2d 249 (Ky.1977) (where the Kentucky Supreme Court held that title to a truck passed at the time of delivery, regardless of the status of the title documents); *See also, McKenzie v. Oliver*, 571 S.W.2d 102 (Ky.Ct. App.1978) and *R.O. Hahn v. MDG Diagnostics, Inc.*, 737 S.W.2d 180 (Ky.Ct.App.1987). By maintaining the registration certificates, the most Young retained was a security interest in the cattle, which he admitted was never perfected. KRS 355.2–401(2); *See* Nowka and Leibson, *The Uniform Commercial Code of Kentucky* (2d ed.), Section 2.8(A) at page 249 (1992). Having found no conversion on the part of BGLM, we need not address Young's claim for punitive damages.

## II. WHETHER BGLM'S CONDUCT IN SELLING THE CATTLE AND DISTRIBUTING THE PROCEEDS TO CLARK CONSTITUTES NEGLIGENCE.

In order to recover under the theory of negligence, Young must first establish a duty on the part of BGLM to inquire about the true ownership of the cattle prior to either selling the cattle on November 11, 1994, or prior to distributing the sale proceeds to Clark. Several experts in the stockyards business testified at trial regarding the proper procedures for a stockyard to take under the Packers and Stockyards Act. The testimony established that it was proper for BGLM to pay proceeds over to a Consignor such as Clark. (Pearce, TR 69; Gibson, TR 86–87). The testimony also established that, although unusual, there are instances where registered cattle are sold through a commercial sales barn such as BGLM. (Pearce, TR 68). It was also established that stockyards such as BGLM have a duty to pay proceeds over to somebody within 24 hours of the sale (*See* Deposition of Jerry D. Garner, employee of USDA Packers and Stockyards Administration).

Young cites no cases requiring a specific duty of inquiry on the part of the stockyards, but relies on the general duty of "good faith" which is imposed by KRS 355.1-203. KRS 355.1-201(19) defines "good faith" as "honesty in fact in the conduct or transaction concerned." Young put on extensive testimony regarding the appearance of these purebred Black Angus cattle (which were peeled, trimmed, had their toenails painted and their tails bobbed) as distinguished from the garden-variety, commercial-grade beef cattle that come through the sales barn on a daily basis. However, Young's own expert, Jo Meng (an expert with regard to Black Angus cattle), testified that clipped cattle's hair grows out much the same way that ours does. (TR 54). Jo Meng, when asked whether a person in the livestock business could generally tell registered cattle from commercial grade cattle, answered, "not necessarily." (TR 53). He went on to explain that it would depend on their appearance, the ear tags, and the time lapse between when they had been clipped and when they arrived at the sales barn. (TR 53–54).

The testimony established that Jay Wright, Young's ranch manager, began clipping these cattle approximately two weeks before the October 30, 1994 production sale. (Wright, TR 54). The cattle did not arrive at BGLM until November 11, 1994, some three to four weeks later, after being hauled several hundred miles. Dr. Paul Graham, BGLM's veterinarian, described some of the cattle as looking "gutted out" from the long haul. (*See* Deposition of Dr. Paul Graham).

The Kentucky Court of Appeals summarizes the duty of "good faith" when it says:

The circumstances and conditions may be so cogent and obvious that to remain passive amounts to bad faith. Where a purchaser has actual knowledge of suspicious circumstances or facts coupled with the means of informing himself of the facts and willfully refrains from making inquiries, his intentional ignorance may amount to bad faith.

*See Peoples National Bank v. Guier,* 145 S.W.2d 1042, 1047 (Ky.1940).

We do not find the facts and circumstances in this case to be so cogent and obvious to impose a duty on BGLM to have investigated the true ownership of Young's cattle prior to their sale. Young did not contact BGLM prior to the November 11, 1994 sale and notify BGLM of his ownership interest in the cattle, thus BGLM cannot be charged with actual knowledge of the suspicious circumstances surrounding Clark's scheme. Further, the cattle were hauled a long distance and had been groomed some four weeks prior to their arrival at BGLM. Thus, their condition and appearance may not have been suspicious enough to find that BGLM willfully failed to inquire into their true ownership, especially in light of the expert testimony that established that it is not unusual to sell purebred cattle at a sales barn.

Young, a person highly-experienced in the cattle industry, sold the cattle to Clark on credit, and transferred unfettered possession of the cattle to Clark's trucker, Brent Yates, who hauled the cattle away, without any specifications from Young as to how or where the cattle were to be sold. Brent Yates, pursuant to Clark's instructions, dropped the cattle off at BGLM for sale. The cumulative expert testimony at trial unequivocally established that it is standard in the industry for cattle to be "dropped off" by someone other than the owner and for a stockyards to sell cattle within a very short period of time so as not to interrupt the stream of commerce. BGLM simply sold these fifty head of cattle along with the high volume of livestock that flow through the barn on a daily basis.

Given this set of facts, the Court cannot find that BGLM breached its duty of "good faith," nor can we find that BGLM breached any duty imposed by the Packers & Stockyards Act, 7 U.S.C. § 181 *et seq.*

### Conclusion

We recognize that Young is certainly an innocent party who had the unfortunate fate of dealing with a thief. Equity is not served, however, by requiring BGLM, who is likewise blameless, to pay for the fraud perpetrated upon Young by Clark. *See Foley,* 753 S.W.2d at 879. It is most unfortunate that this Court is unable to make the true perpe-

**444**

trator pay for the damages suffered by Young.

Pursuant to the findings and conclusions of this Memorandum, the Court finds no liability on the part of BGLM and has entered an Order dismissing the Counterclaims of George Young against BGLM.